**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**

| | |
|---|---|
| SANDRA HERMANN, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AFLAC INCORPORATED,<br><br>Defendant. | Case No. ___________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sandra Hermann ("Plaintiff"), by and through her undersigned counsel, individually, and on behalf of a class of all others similarly situated (the "Class"), files this Class Action Complaint against Aflac Incorporated ("Aflac" or "Defendant"). Plaintiff's allegations are made based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief and investigation of counsel, as to all other matters.

## I. NATURE OF THE ACTION

1. This is a class action on behalf of consumers that have been, and continue to be, harmed as a result of Aflac's failure to adequately and reasonably safeguard its network and information systems, which resulted in a cyberattack that compromised protected personal information ("Personally Identifiable Information" or "PII") and protected health information ("Protected Health Information" or "PHI") (collectively, "Private Information"), *inter alia*, claims information, health

information, social security numbers, and/or other personal information, related to customers, beneficiaries, employees, agents, and other individuals.[1] This lawsuit also alleges Defendant's failure to comply with industry standards to protect information systems that contain Private Information.

2. Aflac, a Fortune 500 company, provides financial protection and supplemental insurance to millions of policyholders and customers through its subsidiaries in the U.S. and Japan.[2] In the U.S., Aflac is the number one provider of supplemental health insurance products.[3] Aflac maintains 50-million policyholders worldwide.[4]

3. In order to obtain Defendant's services, Aflac customers are required to directly entrust Aflac with their Private Information, which Aflac uses in order to perform their regular business services.

4. As a provider of supplemental insurance, Aflac therefore knowingly collects and stores sensitive Private Information of their customers, and has a resulting duty to secure such information from unauthorized access and exfiltration.

---

[1] AFLAC, *Information Related to the Recently Disclosed Cyber Security Incident* (2025), https://www.aflac.com/docs/aflac-cyber-incident-6-24-2025.pdf

[2] AFLAC, *About Aflac Incorporated*, https://www.aflac.com/about-aflac/default.aspx

[3] AFLAC, *Aflac Incorporated Discloses Cybersecurity Incident* (Jun. 20, 2025), https://newsroom.aflac.com/2025-06-20-Aflac-Incorporated-Discloses-Cybersecurity-Incident

[4] AFLAC, *Join Our Winning Team*, https://careers.aflac.com/content/Who-we-are/?locale=en_US

5. Aflac expressly recognizes these duties, representing that "Aflac is fully committed to its compliance with the HIPAA Rules, including the Privacy Rule."[5]

6. Despite Aflac's duty to safeguard customers' Private Information, on June 20, 2025, Aflac disclosed it became aware of a cybersecurity incident from June 12, 2025, wherein it detected suspicious activity on its U.S. network.[6] The attack, linked to a broader cybercrime campaign targeting the insurance industry, had preliminary findings suggesting the breach involved social engineering and may have exposed sensitive personal data, including claims, health, and Social Security information (the "Data Breach" or "Breach").[7]

7. As a direct and proximate result of Aflac's negligent failure to implement reasonable data security measures, Plaintiff's and Class members' Private Information—claims information, health information, social security numbers, and/or other personal information—was exfiltrated and is now in the hands of cybercriminals.

8. Plaintiff and Class members are now at a significantly increased and certainly impending risk of fraud, identity theft, and other harms caused by the

---

[5] AFLAC, *Privacy Policy* (2023), https://www.aflac.com/privacy-center/privacy-policy.aspx

[6] *See* AFLAC, *supra* note 1.

[7] *Id*.

unauthorized disclosure of their Private Information—risks which may last for the rest of their lives. Consequently, Plaintiff and Class members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

9. Plaintiff brings claims for negligence, negligence *per se*, unjust enrichment, and declaratory judgment, seeking damages and injunctive relief, including the adoption of reasonably sufficient data security practices to safeguard the Private Information in Defendant's possession in order to prevent incidents like the Data Breach from reoccurring in the future.

## II. PARTIES

10. Plaintiff Sandra Hermann, at all relevant times, is and was a citizen of the State of Arkansas and a resident of the County of Craighead. During the relevant period through the present, Plaintiff has maintained an active insurance policy through Aflac.

11. Defendant Aflac Incorporated is a corporation organized under the laws of the State of Georgia, maintaining its principal place of business at 1932 Wynnton Rd, Columbus, Georgia, 31999.

## III. JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d) ("CAFA") because Plaintiff and at least one member of the Class, as

defined below, are citizens of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

13. This Court has general personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District and maintained Plaintiff's and Class members' Private Information in this District.

14. This Court is the proper venue for this action pursuant to 28 U.S.C. §1391(b)(1) because Defendant resides in this District, a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and Defendant conducts substantial business within this District.

## IV. FACTUAL BACKGROUND

### A. Aflac's Business

15. Defendant is a Fortune 500 company that provides financial protection to millions of policyholders and customers through its subsidiaries in the U.S. and Japan.

16. Aflac's website states that it "maintain[s] technical, physical, and administrative security measures designed to protect the security of your personal information against loss, misuse, unauthorized access, disclosure, or alteration."[8]

---

[8] *See* AFLAC, *supra* note 5.

17. Aflac provides its customers with supplemental health insurance for accident, cancer, critical illness, hospital stays, short-term disability, dental, and vision care.[9]

18. As part of providing their services, Aflac is entrusted with sensitive personal information that their customers provide to it. Specifically, the sensitive Private Information that Plaintiff and the proposed Class provided included, but is not limited to, *inter alia*, claims information, health information, social security numbers, and/or other personal information.

19. When entrusting Aflac with their Private Information, Plaintiff and Class members reasonably expect Defendant would use the utmost care to keep this information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

20. Plaintiff and Class members had a reasonable expectation, based in part on Aflac's own statements, that their Private Information would be protected. Aflac represents that it "protect[s] your personal information using security measures."[10]

---

[9] AFLAC, *What is Supplemental Health Insurance?*, https://www.aflac.com/resources/health-insurance/what-is-supplemental-health-insurance.aspx

[10] *See* AFLAC, *supra* note 5.

21. However, despite Defendant's stated commitment to data security, Aflac failed to adopt reasonable measures to prevent the unauthorized access to Plaintiff's and Class members' Private Information by unauthorized bad actors.

**B. The Data Breach**

22. On or about June 12, 2025, Aflac became aware of a potential cybersecurity incident as it identified unauthorized access to its network.

23. On June 20, 2025, Aflac issued a Form 8-K with the U.S. Securities and Exchange Commission that stated:

> On June 12, 2025, Aflac Incorporated, a Georgia corporation (the "Company"), identified unauthorized access to its network. The Company promptly initiated its cybersecurity incident response protocols and believes that it contained the intrusion within hours. The Company's business remains operational, and its systems were not affected by ransomware. The Company continues to serve its policyholders as it responds to this incident and can underwrite policies, review claims, and otherwise service customers as usual. The Company has engaged leading third-party cybersecurity experts to support the Company's response to the incident.
>
> The Company has commenced a review of potentially impacted files. That review is in its early stages. The Company is unable to determine the total number of affected individuals until that review is completed. The potentially impacted files contain claims information, health information, social security numbers, and/or other personal information, related to customers, beneficiaries, employees, agents, and other individuals in its U.S. business. The Company anticipates notifying regulators and providing appropriate notifications to individuals affected by this incident. Individuals will be offered free credit monitoring and identity theft protection services.

> At this time, the full scope and potential ultimate impact on the Company are not known.[11]

24. Although Aflac stated that the review of the Data Breach is still being investigated, it did confirm that the affected data included: "impacted files [that] contain claims information, health information, social security numbers, and/or other personal information, related to customers."[12]

25. John Hultquist, chief analyst at Google's threat intelligence unit, stated on June 23, 2025 that they had identified several breaches in the U.S. resembling the tactics used by Scattered Spider, a loosely organized group of hackers known for employing social engineering and, at times, intimidation to infiltrate company networks via help desks and call centers.[13]

26. Although Aflac has yet to confirm the source of the breach or who was behind it, the breach exhibits all the signs of a Scattered Spider attack.[14] Indeed, Aflac stated that, "This attack, like many insurance companies are currently

---

[11] Aflac Incorporated, Form 8-K (Jun. 20, 2025).

[12] *Id.*

[13] Zack Whittaker, *US insurance giant Aflac says customers' personal data stolen during cyberattack*, TECHCRUNCH (Jun. 23, 2025), https://techcrunch.com/2025/06/23/us-insurance-giant-aflac-says-customers-personal-data-stolen-during-cyberattack/

[14] Ellen Jennings-Trace, *Aflac could be the latest US insurance giant hit by a Scattered Spider cyberattack*, TECHRADAR (Jun. 23, 2025), https://www.techradar.com/pro/security/aflac-could-be-the-latest-us-insurance-giant-hit-by-scattered-spider-attacks

experiencing, was caused by a sophisticated cybercrime group. This was part of a cybercrime campaign against the insurance industry."[15]

27. Upon information and belief, the Data Breach occurred as a direct and proximate result of Aflac's intentional, willful, reckless, and/or negligent failure to implement and follow basic security procedures in order to protect their customers' Private Information. Indeed, had Aflac properly maintained and monitored their computer systems that stored the Private Information, Defendant would have discovered the Data Breach sooner rather than allowing the cybercriminals unimpeded access to exfiltrate Plaintiff's and Class members' Private Information.

28. In any event, the scope of the Data Breach shows the severity of Aflac's data security failings. The cybercriminals were able to gain access to Aflac's customers' Private Information. If Aflac had even minimal data security measures in place, they would have been able to detect the Data Breach at a point before cybercriminals were able to successfully obtain their customers' data.

### C. The Value of Private Information and Effects of Unauthorized Disclosure

29. Aflac was well aware that the protected Private Information which they acquire was highly sensitive and of significant value to those who would use it for wrongful, nefarious purposes.

---

[15] *See* AFLAC, *supra* note 1.

30. Aflac also knew that a breach of their computer systems, and exposure of the Private Information therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised.

31. These risks are not theoretical. Numerous high-profile breaches have occurred at companies such as Blackbaud, Fortra, Snowflake, Progress Software, Change Healthcare, Accellion, amongst others, in recent years. Indeed, news reports indicated that the notorious hacking group known as Scattered Spider, which previously targeting major U.K. retailers like Marks & Spencer and Harrods, has now pivoted to the U.S. insurance sector, using sophisticated social-engineering schemes to breach insurers like Erie Indemnity and Philadelphia Insurance by impersonating employees to steal sensitive customer data.[16] These breaches put Defendant on notice that their electronic records would be targeted by cybercriminals.

32. PII, PHI, and Private Information are valuable commodities to identity thieves. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use this information to commit an array of crimes including identity theft, and

---

[16] Angus Loten and James Rundle, *Insurers 'Under Siege' by Notorious Hacking Group*, THE WALL STREET JOURNAL (Jun. 24, 2025), https://www.wsj.com/articles/insurers-under-siege-by-notorious-hacking-group-7cb68a8e?utm_source=chatgpt.com

medical and financial fraud.[17] Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information and other protected financial information on multiple underground internet websites, commonly referred to as the "dark web."

33. Criminals often trade stolen Private Information on the "cyber black market" for years following a breach. Cybercriminals can also post stolen Private Information on the internet, thereby making such information publicly available. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2023, there were 6,077 recorded data breach incidents, exposing 17 billion records. The U.S. specifically saw a 19.8% year-over-year increase in data breaches as compared to 2022.[18]

34. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9

---

[17] FED. TRADE COMM'N CONSUMER ADVICE, *What To Know About Identity Theft*, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft

[18] FLASHPOINT, *2024 Global Threat Intelligence Report* (2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

million people reported some form of identity fraud compared to 5.7 million people in 2021.[19]

35. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class members especially vulnerable to identity theft, tax fraud, credit and bank fraud, and more.

36. **Social Security Numbers**. Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

37. The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> You should know that other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will

---

19 INS. INFO. INST., *Facts + Statistics: Identity theft and cybercrime*, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20

> not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new SSN, you shouldn't use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information isn't associated with your new number, the absence of any credit history under your new number may make it more difficult for you to get credit.[20]

38. Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit, among other services. Often, Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security numbers a prime target for cybercriminals and a particularly attractive form of Private Information to steal and then sell.

39. **Driver's License Numbers**. Driver's license numbers are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive. This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file

---

[20] SOC. SEC. ADMIN., *Identify Theft and Your Social Security Numbers*, https://www.ssa.gov/pubs/EN-05-10064.pdf; *see also* Michele Lerner, *Identity Thieves Are After Your Children*, YAHOO! FIN. (Mar. 11, 2013), https://finance.yahoo.com/news/2013-03-11-identity-theft-children-prevention.html

with the DMV, places of employment, doctor's offices, government agencies, and other entities.

40. For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and fraud. This information is valuable because cyber criminals can use it to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

41. Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the type of PII at stake here—unique driver's license numbers—cannot be easily replaced.

42. The ramifications of Aflac's failure to keep Plaintiff's and Class members' PII secure are long-lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

43. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the U.S. Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim.

> An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[21]

44. Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even where cybercriminals do not gain access to a complete set of an individual's PII during a data breach, cybercriminals can cross-reference two or more sources of PII to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

45. The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

46. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity

---

[21] Erika Harrell, *Victims of Identity Theft, 2018*, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., at 9 (2020), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf

fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[22] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication methods."[23]

47. A poll of security executives predicted an increase in attacks over the next two years from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[24]

48. Due to high-profile data breaches at other companies, Defendant knew or should have known that their customers' information would be targeted by cybercriminals.

---

[22] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME, https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/

[23] Administotle, *Protection Against Fullz and Fraud*, INTEGRITY ARTISTOTLE (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/

[24] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need to Know*, FORBES (Jun. 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864

49. Defendant also knew or should have known the importance of safeguarding the Private Information with which they were entrusted and of the foreseeable consequences if their data security systems were breached. Aflac failed, however, to take adequate cybersecurity measures to prevent the Data Breach and the exfiltration of their customers' Private Information from occurring.

### D. Aflac Failed to Comply with FTC Guidelines and Industry Best Practices

50. Aflac is prohibited by the Federal Trade Commission Act of 1914, 15 U.S.C. §45 ("FTC Act"), from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

51. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[25]

52. The FTC recommends that businesses:

a. identify all connections to the computers where sensitive information is stored;

---

[25] FEDERAL TRADE COMM'N, *Start with Security: A Guide for Business* (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf

b. assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks;

c. do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business;

d. scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine;

e. pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks;

f. use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the Internet;

g. determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically;

h. monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day; and

i. monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their

> system to an unknown user. If large amounts of information are being transmitted from a business's network, the transmission should be investigated to make sure it is authorized.[26]

53. The FTC further recommends businesses take additional cybersecurity steps, which include:

a. conducting an inventory of all company devices that store sensitive data, and understanding what types of PII is stored on those devices;

b. encrypting sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c. crafting a data security plan that involves both physical security (e.g., locking up physical files) and electronic security, and training employees regarding the data security plan;

d. promptly disposing of PII that is no longer needed, and retaining sensitive data only as long as companies maintain a legitimate business need for the information; and

e. developing a plan to handle a data breach or data security incident, if and when such an incident occurs. [27]

54. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the

---

[26] FED. TRADE COMM'N, *Protecting Personal Information: A Guide for Business* (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

[27] *Id.*

FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

55. Upon information and belief, Aflac failed to properly implement one or more of the basic data security practices described above. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to PII resulted in the unauthorized access to, and exfiltration of, Plaintiff's and Class members' PII.

56. Aflac's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

57. Similarly, the U.S. government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[28]

58. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security

---

[28] *See* NIST, *Framework for Improving Critical Infrastructure Cybersecurity*, at Appendix A, Table 2 (2018), https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf

controls, network monitoring, breach detection, and incident response.[29] Upon information and belief, Aflac failed to adhere to the NIST guidance.

59. Defendant's failure to protect Plaintiff's and Class members' PII is a result of Aflac's failure to adopt reasonable safeguards as required by the FTC, NIST, and industry best practices. This includes Aflac's failure to enable multi-factor authentication on employee accounts, one of the most basic cybersecurity features.

60. Aflac was, at all times, fully aware of their obligations to protect the PII of their customers because of their business model of collecting PII to provide their cryptocurrency exchange services. Aflac was also aware of the significant repercussions that would result from their failure to do so.

### E. Aflac is Subject to HIPAA as a Business Associate of Covered Entities

61. Aflac is a HIPAA covered business associate that provides services to various healthcare providers (*i.e.*, HIPAA "Covered Entities"). As a regular and necessary part of its business, Aflac collects and stores the highly sensitive PHI of its clients' patients. Aflac is required under federal law to maintain the strictest confidentiality of the patients' PHI that it acquires, receives, and collects, and Aflac

---

[29] *Id.* at Appendix A, Table 2 at 26-43.

is further required to maintain sufficient safeguards to protect that PHI from being accessed by unauthorized third parties.

62. Aflac is obligated to implement reasonable data security measures to protect a person's PII and PHI. As a HIPAA covered business associate, Aflac is required to enter into contracts with its Covered Entities to ensure that it will implement adequate safeguards to prevent unauthorized use or disclosure of PHI, including by implementing requirements of the HIPAA Security Rule and to report to the Covered Entities any unauthorized use or disclosure of PHI, including incidents that constitute breaches of unsecured PHI as in the case of a data breach like the one complained of herein.

63. As a condition of receiving Aflac's services, Aflac requires that Covered Entities and their patients, including Plaintiff and Class members, entrust it with highly sensitive personal information. Due to the nature of Aflac's business, which includes providing supplemental insurance coverage, Aflac would be unable to engage in its regular business activities without collecting and aggregating PHI that it knows and understands to be sensitive and confidential.

64. Plaintiff's and Class members' PII and PHI were maintained and/or received by Aflac through its pharmacies and healthcare provider clients. As such, Aflac was entrusted to implement reasonable data security measures to protect such information.

65. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' sensitive information, Aflac assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' PII and/or PHI from unauthorized disclosure.

66. Further, given the application of HIPAA to Aflac, and that Plaintiff and Class members directly or indirectly entrusted their PHI to Aflac in order to receive healthcare services, Plaintiff and Class members reasonably expected that Aflac would safeguard their highly sensitive information and keep their PHI confidential.

### F. Plaintiff and Class Members Suffered Damages

67. The ramifications of Aflac's failure to keep consumers' Private Information secure are long-lasting and severe. Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff and Class members significant injuries and harm in several ways, including theft of their Private Information as well as substantial and imminent risk of identity theft and fraud. Plaintiff and Class members must immediately devote time, energy, and money to: (1) closely monitor their bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering, spear phishing, or

extortion attacks; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

68. In 2019, the U.S. Government Accountability Office ("GAO") released a report addressing the steps consumers can take after a data breach.[30] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. It is clear from the GAO's recommendations that the steps data breach victims (like Plaintiff and Class members) must take after a data breach, like Defendant's, are both time-consuming and of only limited and short-term effectiveness.

69. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (such as an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[31]

---

[30] GAO, *Data Breaches Range of Consumer Risks Highlights Limitations of Identity Theft Services* (2019), https://www.gao.gov/assets/gao-19-230.pdf

[31] *See* FED. TRADE COMM'N, *What To Do Right Away*, https://www.identitytheft.gov/Steps

70. Further, once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse.

71. It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the GAO, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[32]

72. For these reasons, Plaintiff and Class members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct.

73. The value of Plaintiff's and Class members' Private Information has been diminished by its exposure in the Data Breach. Indeed, Private Information is a valuable commodity to identity thieves, and, once it has been compromised,

---

[32] *See* GAO, *Report to Congressional Requester* (2007), https://www.gao.gov/assets/a262904.html

criminals will use it and trade the information on the cyber black market for years thereafter.[33]

74. The reality is that cybercriminals seek nefarious outcomes from a data breach, and stolen Private Information can be used to carry out a variety of crimes.

75. Plaintiff and Class members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect their customers' Private Information.

76. As a result of Aflac's failures, Plaintiff and Class members face an increased risk of potential scams, identity theft and fraud, and related cybercrimes because of the Data Breach. Those impacted are under heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

77. Plaintiff and Class members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their Private Information to strangers and cybercriminals.

---

[33] Trustwave SpiderLabs, *The Price Cybercriminals Charge for Stolen Data*, TRUSTWAVE (Aug. 3, 2022), https://www.trustwave.com/en-us/resources/blogs/spiderlabs-blog/the-price-cybercriminals-charge-for-stolen-data/

**G. Plaintiff's Experience**

78. Plaintiff has been a policyholder of Aflac since 2001 and uses Defendant's services. In order to utilize Defendant's supplemental insurance, Plaintiff was required to entrust Aflac with her Private Information. In collecting and maintaining the Private Information of Plaintiff, Defendant undertook a duty to act reasonably in their handling of Plaintiff's Private Information. Aflac, however, did not take reasonable care of Plaintiff's Private Information, leading to its exposure and compromise as a direct result of Defendant's inadequate data security measures.

79. On or about June 12, 2025, Aflac posted a notification on Plaintiff's landing page of the Aflac website that it had suffered a cybersecurity incident. The notification stated that an "unauthorized party used social engineering tactics to gain access to our network." The notification further stated that the "potentially impacted files contain claims information, health information, social security numbers, and/or other personal information, related to customers, beneficiaries, employees, agents, and other individuals in our U.S. business," and that her Private Information may have been exposed.

80. Since the announcement of the Data Breach, Plaintiff has been required to spend her valuable time and effort taking steps to avoid potential scams and mitigate the risk of misuse of her Private Information. Specifically, Plaintiff has been required to spend her valuable time and effort monitoring her Aflac account

and resetting passwords to her financial and personal accounts. Plaintiff would not have had to engage in these time-intensive efforts but for the Data Breach.

81. Plaintiff has suffered actual injury from having her Private Information exposed and/or stolen as a result of the Data Breach, including: (a) mitigation efforts to prevent scammers accessing her account; (b) mitigation efforts to prevent the misuse of her Private Information; (c) damages to and diminution of the value of her Private Information, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (d) loss of privacy.

82. Given the nature of the information compromised in the Data Breach and the propensity of criminals to use such information to commit a wide variety of crimes, Plaintiff faces a significant, present, and ongoing risk of scams, identity theft and fraud, and other identity-related fraud now and into the indefinite future.

83. In addition, knowing that hackers gained access to her Private Information and that this information likely has been and will be used in the future for scams, identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

## V. CLASS ACTION ALLEGATIONS

84. Plaintiff, individually, and on behalf of all others similarly situated, brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the Class defined as:

> All individuals in the United States and its territories whose Private Information was compromised in the Aflac Data Breach (the "Class").

85. Excluded from the proposed Class are Defendant, its subsidiaries and affiliates, their officers, directors, and members of their officers' and directors' immediate families, any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of those judicial officers' immediate families.

86. Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

87. **Numerosity.** The Class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including, but not limited to, the files implicated in the Data Breach. Upon

information and belief, the Class, at minimum, comprises over a million individuals.[34]

88. **Commonality.** This action involves questions of law and fact that are common to Plaintiff and the Class members. Such common questions include, but are not limited to:

- whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class members;
- whether Defendant was negligent in collecting and storing Plaintiff's and Class members' Private Information;
- whether Defendant had duties not to disclose the Private Information of Plaintiff and Class members to unauthorized third parties;
- whether Defendant took reasonable steps and measures to safeguard Plaintiff's and Class members' Private Information;
- whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class members;
- whether Defendant breached their duties to exercise reasonable care in handling Plaintiff's and Class members' Private Information;
- whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

---

[34] Sergiu Gatlan, *Aflac discloses breach amidst Scattered Spider insurance attacks*, BLEEPING COMPUTER (Jun. 20, 2025), https://www.bleepingcomputer.com/news/security/aflac-discloses-breach-amidst-scattered-spider-insurance-attacks/

- whether Plaintiff and Class members are entitled to damages as a result of Defendant's wrongful conduct; and
- whether Plaintiff and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

89. **Typicality.** Plaintiff's claims are typical of the claims of the Class members. The claims of Plaintiff and Class members are based on the same legal theories and arise from the same failure by Defendant to safeguard their Private Information. Plaintiff and Class members entrusted Defendant with their Private Information, and it was subsequently accessed by an unauthorized third party.

90. **Adequacy of Representation.** Plaintiff is an adequate representative of the proposed Class because her interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the proposed Class will not be harmed. Furthermore, the interests of the Class members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

91. **Superiority.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the proposed Class is impracticable. This proposed class action presents fewer management difficulties

than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

92. **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages is common to Plaintiff and each member of the proposed Class. If Defendant breached their duties and released Plaintiff's and Class members' Private Information, then Plaintiff and each Class member suffered damages by that conduct.

93. **Ascertainability:** Members of the proposed Class are ascertainable. Class membership is defined using objective criteria, and Class members may be readily identified through Defendant's books and records.

## VI. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

94. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 93 above as if fully set forth herein.

95. Defendant owed a duty under common law to Plaintiff and Class members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

96. Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiff's and Class members' Private Information in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of their security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by their own security systems, regarding intrusions to their networks; and (d) maintaining data security measures consistent with industry standards.

97. Aflac's duty to use reasonable care arose from several sources, including, but not limited to, those described below.

98. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable Private Information that is routinely targeted by criminals for unauthorized access, Aflac was obligated to act with reasonable care to protect against these foreseeable threats.

99. Defendant also owed a common law duty because their conduct created a foreseeable risk of harm to Plaintiff and Class members. Aflac's conduct included their failure to adequately restrict access to their computer networks and/or servers that held individuals' Private Information.

100. Defendant also knew or should have known of the inherent risk in collecting and storing massive amounts of Private Information, the importance of implementing adequate data security measures to protect that Private Information, and the frequency of cyberattacks, such as the Data Breach, in the U.S. insurance sector.

101. Defendant breached the duties owed to Plaintiff and Class members and thus was negligent. Aflac breached these duties by, among other things: (a) mismanaging their system and failing to reasonably identify foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of Private Information; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a

reasonable time thereafter; (g) failing to follow their own privacy policies provided to customers; and (h) failing to adequately train and supervise employees and third-party vendors with access or credentials to systems and databases containing sensitive Private Information.

102. But for Aflac's wrongful and negligent breach of their duties owed to Plaintiff and Class members, their Private Information would not have been accessed, exfiltrated, and compromised by cybercriminals.

103. As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered injuries including:

a. theft of their Private Information;

b. costs associated with requesting credit freezes;

c. costs associated with the detection and prevention of identity theft;

d. costs associated with purchasing credit monitoring and identity theft protection services;

e. lowered credit scores resulting from credit inquiries following fraudulent activities;

f. costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g. the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

h. damages to and diminution in value of their Private Information entrusted to Aflac with the mutual understanding that Defendant

would safeguard Plaintiff's and Class members' data against theft and not allow access and misuse of their data by others; and

i. continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class members.

104. As a direct and proximate result of Aflac's negligence, including their gross negligence, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

105. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 93 above as if fully set forth herein.

106. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Aflac for failing to use reasonable measures to protect PII. 15 U.S.C. §45(a)(1). Various FTC publications and orders also form the basis of Defendant's duties.

107. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect customers' Private Information and not complying with the industry standards. Aflac's conduct was particularly unreasonable given

the nature and amount of Private Information they obtained and stored and the foreseeable consequences of a data breach.

108. Plaintiff and Class members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

109. Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over 50 enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class members.

110. Aflac's violation of Section 5 of the FTC Act constitutes negligence *per se*.

111. As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered injuries, including those identified in Paragraph 100 above.

112. As a direct and proximate result of Aflac's negligence, Plaintiff and Class members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

113. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 93 above as if fully set forth herein.

114. Plaintiff and Class members conferred a monetary benefit on Aflac by providing them with their valuable Private Information.

115. Aflac knew that Plaintiff and Class members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining the Private Information entrusted to them. Defendant profited from Plaintiff's and Class members' Private Information and use of Plaintiff's and Class members' Private Information for business purposes.

116. Defendant failed to secure Plaintiff's and Class members' Private Information and, therefore, did not fully compensate Plaintiff or Class members for the value that their Private Information provided.

117. Aflac acquired the Private Information through inequitable record retention as they failed to disclose the inadequate data security practices previously alleged.

118. If Plaintiff and Class members had known Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor,

supervise, and secure their Private Information, they would not have agreed to the entrustment of their Private Information to Defendant.

119. Under the circumstances, it would be unjust for Aflac to be permitted to retain any of the benefits that Plaintiff and Class members conferred upon them.

120. Plaintiff and Class members are without an adequate remedy at law.

121. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered injuries, including those identified in Paragraph 100 above.

122. Plaintiff and Class members are entitled to restitution and/or damages from Aflac and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from their wrongful conduct, as well as return of their sensitive Private Information and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class members may seek restitution or compensation.

**FOURTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiff and the Class)**

123. Plaintiff restates and realleges the allegations contained in paragraphs 1 through 93 above as if fully set forth herein.

124. Under the Federal Declaratory Judgment Act, 28 U.S.C. §2201 *et seq*. ("DJA"), this Court is authorized to enter a judgment declaring the rights and legal

relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations described herein.

125. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class members' Private Information and whether Aflac is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their Private Information. Plaintiff alleges that Defendant still possesses Plaintiff's and Class members' Private Information, and that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and Class members continue to suffer injury as a result of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

126. Pursuant to its authority under the DJA, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure consumers' Private Information under the common law and Section 5 of the FTC Act; and

b. Defendant continues to breach this legal duty by failing to employ reasonable data security measures to safeguard Plaintiff's and Class members' Private Information.

127. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with the law and industry standards to protect consumers' Private Information in their possession.

128. If an injunction is not issued, Plaintiff and Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Aflac. The risk of another such breach is real, immediate, and substantial. If another breach at Aflac occurs, Plaintiff and Class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

129. The hardship to Plaintiff and Class members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff and Class members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant in complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

130. Issuance of the requested injunction will not do a disservice to the public interest. On the contrary, such an injunction would benefit the public by preventing another data breach at Aflac, thus eliminating the additional injuries that

would result to Plaintiff and consumers whose confidential information would be further compromised.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all others similarly situated, prays for relief as follows:

A. For an order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For damages in an amount to be determined by the trier of fact;

D. For an order of restitution and all other forms of equitable monetary relief;

E. Declaratory and injunctive relief as described herein;

F. Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

G. Awarding pre- and post-judgment interest on any amounts awarded; and

H. Awarding such other and further relief as may be just and proper.

## VIII. JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: July 1, 2025

/s/ MaryBeth V. Gibson
MaryBeth V. Gibson
Georgia Bar No. 725843
**Gibson Consumer Law Group, LLC**
4279 Roswell Road
Suite 208-108
Atlanta, GA 30342
Tel: 678-642-2503
marybeth@gibsonconsumerlawgroup.com

Joseph P. Guglielmo (*pro hac vice* forthcoming)
Ethan S. Binder (*pro hac vice* forthcoming)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel.: 212-223-6444
Fax: 212-223-6334
jguglielmo@scott-scott.com
ebinder@scott-scott.com

*Attorneys for Plaintiff and the Proposed Class*